## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

RACHEL G. O'NEAL,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:10-cv-531

Beckwith, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 9) and the Commissioner's response in

opposition (Doc. 13).

### PROCEDURAL BACKGROUND

Plaintiff was born in 1957 and was 51 years old at the time of the decision of the

administrative law judge (ALJ). Plaintiff has a high school education and past relevant work

experience as a cashier, home health aide, store manager, private home care worker, seamstress,

and assembler. (Tr. 88, 96-103, 120, 123-32).

Plaintiff filed applications for DIB and SSI with a protective filing date[1] of August 19,

2005, alleging disability since May 13, 2004, due to fibromyalgia, asthma, high blood pressure,

emphysema, arthritis, irritable bowel syndrome (IBS) and severe allergies to cleaning chemicals

---

[1]A protective filing date is deemed to be the date a claimant first contacted the Social Security
Administration about filing for disability benefits. It may be used to establish an earlier application date than when
the Social Security Administration received the claimant's signed application. *See* http://www.ssa.gov/glossary.

and perfumes. (Tr. 66-68, 82, 115-16, 478-81).[2] Plaintiff's applications were denied initially and upon reconsideration. (Tr. 29-31, 38-44, 482-90). Plaintiff requested and was granted a de novo hearing before an ALJ. (Tr. 26, 45-55 ). On August 28, 2008, plaintiff, who was represented by counsel, appeared and testified at a hearing before ALJ Deborah Smith. (Tr. 500-23). Plaintiff's husband, Chester O'Neal, appeared and testified as a witness on behalf of plaintiff. (Tr. 524-30). A medical expert, Arthur Lorber, M.D., and a vocational expert (VE), Donald Shrey, Ph.D., also appeared and testified at the hearing. (Tr. 530-37, 537-44).

On September 16, 2008, the ALJ issued a decision denying plaintiff's DIB and SSI applications. The ALJ determined that plaintiff suffers from the severe impairments of fibromyalgia and left shoulder rotator cuff syndrome. (Tr. 20). The ALJ further determined that plaintiff's alleged respiratory impairment, carpal tunnel syndrome, osteoarthritis, a broken ankle, and depression were non-severe medically determinable impairments. (Tr. 21-22). The ALJ found that plaintiff's impairments do not alone or in combination meet or equal the level of severity described in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 22). According to the ALJ, plaintiff retains the residual functional capacity (RFC) to perform work at the medium level of exertion. Based on Dr. Lorber's testimony, plaintiff can lift/carry up to 25 pounds frequently and 50 pounds occasionally; she has no restrictions on standing, walking, or sitting and can do posturals frequently; and she is limited to only occasional overhead reaching with the left upper extremity. (Tr. 22-23). The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to produce some of the

---

[2] As noted by the Commissioner, plaintiff previously filed an application for DIB in March 2004. The application was denied and the administration denied plaintiff's request to reopen. (Tr. 28, 32-37, 62-65).

alleged symptoms; however, plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms are not credible to the extent they are inconsistent with plaintiff's RFC. (Tr. 23). Relying on the testimony of the VE, the ALJ determined that plaintiff is capable of performing all of her past relevant work. (Tr. 24). According to the ALJ, this work does not require the performance of work-related activities precluded by plaintiff's RFC. (*Id.*). Consequently, the ALJ concluded that plaintiff is not disabled under the Act and is therefore not entitled to disability benefits. (Tr. 25).

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for DIB, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(1), 423. Establishment of a disability is contingent upon two

3

findings.  First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act.  42 U.S.C. § 1382(a); 20 C.F.R. § 416.202.  Eligibility is dependent upon disability, income, and other financial resources.  20 C.F.R. § 416.202.  To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months.  Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy.  20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations.  20 C.F.R. § 404.1520(a) and § 416.920(a).  First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends.  Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends.  An impairment can be considered as not severe only if the impairment is a "slight abnormality" which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work,

irrespective of age, education, and work experience. *Farris v. Secretary of Health and Human Services,* 773 F.2d 85, 90 (6th Cir. 1985)(citation omitted). Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d) and § 416.920(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.,* 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.,* 667 F.2d 524 (6th Cir. 1981).

Plaintiff has the burden of proof at the first four steps of the sequential evaluation process. *Wilson* v. *Commissioner of Social Security,* 378 F.3d 541, 548 (6th Cir. 2004). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon* v. *Apfel,* 168 F.3d 289, 291 (6th Cir. 1999); *Born* v. *Secretary of Health and Human Servs.,* 923 F.2d 1168, 1173 (6th Cir. 1990). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff s individual capacity to perform alternate work considering plaintiffs age, education, and background, as well as the job requirements. *Wilson,* 378 F.3d at 548. *See also Richardson* v. *Secretary of Health & Human*

5

*Services,* 735 F.2d 962, 964 (6th Cir. 1984). Alternatively, in certain instances the

Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut

plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *Wilson,* 378 F.3d at

548.

It is well-established that the findings and opinions of treating physicians are entitled to

substantial weight. "In general, the opinions of treating physicians are accorded greater weight

than those of physicians who examine claimants only once." *Walters* v. *Comm'r of Soc. Sec.,*

127 F.3d 525, 529-530 (6th Cir. 1997). *See also Harris* v. *Heckler,* 756 F.2d 431, 435 (6th Cir.

1985) ("The medical opinions and diagnoses of treating physicians are generally accorded

substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a

treating physician's opinion is entitled to substantially greater weight than the contrary opinion of

a nonexamining medical advisor. *Shelman* v. *Heckler,* 821 F.2d 316, 321 (6th Cir. 1987). If a

treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's]

impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion

is entitled to controlling weight. 20 C.F.R. § 404. 1527(d)(2); *see also Blakley* v. *Commissioner,*

581 F.3d 399, 406 (6th Cir. 2009); *Wilson* v. *Commissioner,* 378 F.3d 541, 544 (6th Cir. 2004).

"The treating physician doctrine is based on the assumption that a medical professional who has

dealt with a claimant and his maladies over a long period of time will have a deeper insight into

the medical condition of the claimant than will a person who has examined a claimant but once,

or who has only seen the claimant's medical records." *Barker* v. *Shalala,* 40 F.3d 789, 794 (6th

Cir. 1994). The Social Security regulations likewise recognize the importance of longevity of

6

treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).

A hypothetical question must accurately portray the claimant's physical and mental impairments. *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987). If a hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints. *Blacha v. Secretary of Health and Human Services*, 927 F.2d 228, 231 (6th Cir. 1990); *see also, Stanley v. Secretary of Health and Human Services,* 39 F.3d 115, 118 (6th Cir. 1994). A hypothetical question need only include those limitations accepted as credible by the ALJ. *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1235 (6th Cir. 1993). A vocational expert's response to a hypothetical question that accurately portrays an individual's impairments constitutes substantial evidence for determining whether a disability exists. *Varley*, 820 F.2d at 779-80.

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the

7

sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043, 1990 WL 94, at *3 (6th Cir. Jan. 2, 1990). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL EVIDENCE

Plaintiff began treating at the Southern Ohio Health Center on March 30, 2001. Plaintiff reported a history of osteoarthritis which mostly affected her hands, allergies to household cleaners, and IBS. (Tr. 317).

On January 3, 2002, plaintiff was evaluated by pulmonary specialist, Elie M. Saab, M.D., for lung nodules, reactive airway disease, and cigarette dependency. Dr. Saab's

8

recommendations included further observation, follow-up testing, and smoking cessation. (Tr. 210-11).

Plaintiff began treating with Phillip Swedberg, M.D., at the Southern Ohio Health Center in September 2002. (Tr. 312-13). At that time, her physical exam was normal. (Tr. 313). Dr. Swedberg assessed osteoarthritis of the hands and hips, IBS, asthma, and low back pain. (Tr. 312). He advised plaintiff to avoid allergens, strong perfumes, and cleaning solutions. (*Id.*).

In May 2003, plaintiff complained of knee pain and diffuse musculoskeletal pain. (Tr. 308). Dr. Swedberg assessed questionable fibromyalgia, restless leg syndrome, and chronic low back pain/sacroileitis, osteoarthritis in both knees, allergic rhinitis, asthma, and stable IBS. (Tr. 308). In July 2003, plaintiff complained of sleepiness and right hip pain. (Tr. 306). Dr. Swedberg assessed stable chronic low back pain, osteoarthritis, asthma, and IBS; allergic rhinitis; and fibromyalgia. (Tr. 306). On September 11, 2003, plaintiff complained of shortness of breath with minimal exertion. Progress notes revealed a normal physical examination of plaintiff's extremities and musculoskeletal system and a normal neurological examination. Dr. Swedberg diagnosed stable fibromyalgia, IBS, and osteoarthritis; asthma; and acute bronchitis. (Tr. 305). On November 13, 2003, plaintiff reported her fibromyalgia was worsening. She reported pain in her shoulders, mid and low back, hips, and knees. She took Celebrex 200 mg. four times per day "with little relief." (Tr. 304). Musculoskeletal examination revealed no joint deformities, full range of motion, no bone, joint or muscle tenderness, 5/5 muscle strength in upper and lower extremities, no muscle atrophy, and a normal gait. Dr. Swedberg prescribed Lexapro four times per day and continued her Flexeril and Celebrex. He also considered a possible referral for pain management or a rheumatology consultation. (Tr. 304).

9

Throughout 2004, Dr. Swedberg continued to consistently characterize plaintiff's fibromyalgia, osteoarthritis, chronic obstructive pulmonary disease (COPD), and asthma as stable. (Tr. 297-302). He continued to prescribe medication. (*Id.*). In December 2004, plaintiff reported that she had been depressed, she had crying spells, and being unemployed made her feel down at times. She also reported her eating habits had worsened and as a result she had gained weight. (Tr. 295). Dr. Swedberg reported that her fibromyalgia with chronic foot pain had been under control with Neurontin, but she could not afford this medication. (*Id.*). Dr. Swedberg assessed depression, fibromyalgia with chronic foot pain, and stable COPD/asthma, hypertension, IBS, and allergic rhinitis. (*Id.*).

In January 2005, plaintiff complained of worsening neck and upper back pain radiating across her shoulders, low back pain, and worsening fibromyalgia. Her asthma/COPD and hypertension were reported to be stable. Dr. Swedberg also diagnosed depression. Dr. Swedberg adjusted her medications and noted plaintiff would get x-rays and physical therapy when her insurance began. (Tr. 294). In February 2005, plaintiff reported she was doing much better than her last visit and the pain was under control. She took Celebrex once per day for pain relief, "although it is exacerbating at times." She reported that sometimes she has "pain all over" and cannot move and at times she cannot get out of bed. Dr. Swedberg assessed chronic low back pain/fibromyalgia much improved; asthma, stable; depression, stable; restless leg syndrome; and hypertension, stable. (Tr. 293). In March 2005, plaintiff's asthma was stable but her osteoarthritis was "poorly controlled." She was taking Robaxin for sleep, which helped with the restless leg syndrome although she still had knee pain. She reported difficulty sleeping secondary to pain. Dr. Swedberg adjusted her medication. (Tr. 291). In July and August 2005,

10

Dr. Swedberg noted plaintiff's osteoarthritis was improved, and her hypertension, anxiety, and depression were stable. (Tr. 289).

Plaintiff presented to the emergency room at Adams County Hospital on August 20, 2005, for chest pain and bronchitis. (Tr. 372-412). The emergency room physician found no significant back or joint pain, joint swelling, stiffness or limited range of motion. (Tr. 372). Plaintiff was admitted due to chest pain. Serial enzymes and EKG were negative. (Tr. 374). Plaintiff was diagnosed with precordial pain and COPD with acute bronchitis. (Tr. 373). She was discharged with instructions to see her family physician. (Tr. 374).

When Dr. Swedberg saw plaintiff on August 22, 2005, he recommended smoking cessation for her COPD. "This was stressed with the [patient]." (Tr. 287). Dr. Swedberg noted that plaintiff's fibromyalgia and osteoarthritis were stable and Celebrex was "very good at controlling the pain." (Tr. 287). She also took Darvocet. *Id.* The following week, plaintiff reported having continued pain from her fibromyalgia and asked if she could increase Darvocet to twice per day. Dr. Swedberg noted that plaintiff was also taking Celebrex which helped her osteoarthritis and fibromyalgia, but she could not afford it and relied on samples he supplied. (Tr. 286).

In October 2005, plaintiff complained of chest symptoms. Dr. Swedberg assessed atypical chest pain secondary to probable bronchitis and COPD or fibromyalgia, osteoarthritis, fibromyalgia, hypertension, and anxiety. Dr. Swedberg continued to prescribe medication, recommended smoking cessation, and provided plaintiff with samples of medications. (Tr. 284-85).

11

On December 6, 2005, plaintiff reported that "[s]he is having difficulty sleeping. She feels tired all of the time, although she cannot get adequate rest at night. She is complaining of worsening hip and back pain. She has 'pain everywhere.' The weather is also bothering her joints. She has neck pain, shoulder pain, wrist pain and hand pain. Her hands are numb at times. Her feet are numb at times. She complains of pain in the hips that goes across the lower back." She also complained of bladder problems. Dr. Swedberg assessed fibromyalgia, depression, stress urinary incontinence, asthma/COPD, and hypertension; adjusted her medication for fibromyalgia pain and depression; and gave her samples of medication. (Tr. 283).

In January 2006, plaintiff complained of having a coughing spasm when she was exposed to someone wearing perfume in Dr. Swedberg's lobby and left shoulder pain when she reached overhead. On examination, plaintiff had normal passive range of motion of her left shoulder but decreased active range of motion and weakness. Dr. Swedberg's assessment was left shoulder pain secondary to rotator cuff syndrome. He also noted that she had fairly stable asthma and stable fibromyalgia and anxiety/depression. (Tr. 280-81). Her stress urinary incontinence was improved. He continued her medications and provided samples of Celebrex for her left shoulder pain. (Tr. 280).

In February 2006, plaintiff had left shoulder pain. Examination revealed decreased range of motion and strength. Plaintiff also complained of pain from fibromyalgia as well as a general lack of energy. Her anxiety and depression were under good control. Her stress urinary incontinence was improved. Dr. Swedberg ordered an x-ray and considered referring plaintiff to an orthopedist. (Tr. 279-80).

In April 2006, plaintiff complained of severe left shoulder and back pain. She was taking ibuprofen and an occasional Darvocet. (Tr. 277). Plaintiff had decreased range of motion in her left shoulder and back but negative bilateral straight leg raise. (*Id.*). The left shoulder x-ray was normal. (*See* Tr. 371). Dr. Swedberg considered obtaining diagnostic imaging of the back but noted plaintiff did not have radicular symptoms. (Tr. 277). In May 2006, plaintiff's left shoulder pain had improved and her low back pain was stable. She was coughing secondary to a sensitivity to perfumes. Dr. Swedberg again recommended smoking cessation. (Tr. 276).

On April 25, 2006, Arthur Sagone, M.D., a state agency physician, reviewed the medical evidence and opined that plaintiff was capable of performing a range of medium work consisting of the ability to occasionally lift 50 pounds, frequently lift 25 pounds, and stand, walk or sit for about 6 hours in an 8-hour workday, with occasional pushing/pulling and reaching overhead with the left upper extremity. Dr. Sagone opined that plaintiff should avoid moderate exposure to fumes, odors, dusts, gases, and poor ventilation due to her allergic reaction to perfumes, cleaning chemicals and strong odors. (Tr. 30, 458-65).

In June 2006, plaintiff reported that she overdid her housework and was having shoulder, back and leg pain. Dr. Swedberg described her fibromyalgia as "moderately severe" and adjusted her medication. Plaintiff asked for a referral to a rheumatologist, Dr. Thomson, in regards to her fibromyalgia. (Tr. 275). In August 2006, plaintiff noted that her asthma was under "good control" and she continued to smoke. She verbalized her unwillingness to quit or uncertainty about her ability to quit. (Tr. 274). Dr. Swedberg reported her hypertension, fibromyalgia, asthma/COPD, osteoarthritis and chronic low back pain, overactive bladder, and anxiety/depression were stable and continued her medications. (*Id.*).

13

On October 26, 2006, a rheumatology/internal medicine specialist, Paul E. Thomson, M.D., examined plaintiff. (Tr. 253-61). Plaintiff's chief complaint was, "I've been diagnosed with fibromyalgia." (Tr. 258). She complained of "pain all over" with her lower back being the worst area of pain, which increased with bending and lifting. (*Id.*). She also complained of bilateral thigh numbness but no leg weakness; stress urinary incontinence; IBS; and pain in multiple areas including her shoulders, wrists, hands, knees, and feet. (*Id.*). Even though plaintiff told Dr. Thomson that she had a prior diagnosis of bilateral carpal tunnel, Dr. Thomson noted that "this was not EMG proven." (*Id.*). Plaintiff also complained of an old possible right pelvic fracture, which did not heal well; a neck rash; chronic mild shortness of breath; and a history of both asthma and COPD. (Tr. 258-59). Plaintiff also reported that she smoked one and one-half packs of cigarettes a day and took various medications. (*Id.*). On physical examination, plaintiff had clear lungs with no accessory muscle use or laboring. (Tr. 260). She had no acute synovitis in her joints, some left shoulder pain with extreme external rotation, "very mild" tenderness over the left glenohumeral joint, "very mild" bilateral knee crepitus, normal range of motion of all of her joints, and negative straight leg raising. (*Id.*). Dr. Thomson noted tender points at the trapezius erector spinae[3], iliac crests, and right SI joint area but no other tender points. (*Id.*). Dr. Thomson noted, "I agree with Dr. Swedberg that the patient does likely have fibromyalgia. Along with this she has irritable bowel syndrome and insomnia. She has osteoarthritis in the left more so than right shoulders, both the patellofemoral joints and perhaps her spine and elsewhere. She is overweight and she smokes to the point where she already has

---

[3]The erector spinae is a large muscle of the back that originates near the sacrum and extends up the length of the back. The erector spinae functions to straighten the back and provides for side-to-side rotation. *See* http://www.spine-health.com/information/erector-spinae.

14

COPD and asthma." (Tr. 260).  He also assessed mechanical low back pain with paraspinal muscle spasm and bilateral carpal tunnel syndrome.  (*Id.*).  Dr. Thomson's treatment plan included additional diagnostic tests to rule out connective tissue syndromes, hypothyroid arthritis, crystal-induced arthritis, or osteoporosis; medication, including Lidoderm patches; weight loss; exercise; and smoking cessation.  (Tr. 260-61).

In October 2006, Dr. Swedberg reported that plaintiff's hypertension, asthma/COPD, fibromyalgia, and overactive bladder were stable.  He continued her medications and ordered the blood tests that Dr. Thomson requested.  (Tr. 273).

On November 13, 2006, plaintiff presented to the emergency room at Adams County Hospital after she tripped over her granddaughter and fell, fracturing her right ankle.  (Tr. 359-67).  The following day, she was seen by Dr. David Herr, who prescribed a walking cast and told her that she may bear weight in five days as tolerated.  (Tr. 243-44).  By January 2007, plaintiff's fracture was stable and exhibited radiographic evidence of a solid union.  (Tr. 242; 357).  Her cast was removed, and she was advised to continue her medication, Celebrex.  (Tr. 242).  Dr. Herr noted that plaintiff was "being treated elsewhere for fibromyalgia" and she could resume her customary activities.  (Tr. 242).

On January 19, 2007, Dr. Swedberg completed an RFC assessment.  Dr. Swedberg opined that plaintiff could lift and carry less than 10 pounds; she could stand, walk and/or sit less than 2 hours in an 8-hour day; she could sit or stand for 5 minutes before she needed to alternate positions; and she needed to lie down at unpredictable intervals during an 8-hour work day, 2 to 3 times a day.  In addition, plaintiff would be limited in reaching and fingering and restricted from any postural activities except occasional twisting.  Dr. Swedberg also opined that plaintiff

15

had environmental restrictions and would be absent from work more than four days per month. Dr. Swedberg supported his limitations by noting his medical findings of low back and upper shoulder pain; bilateral hand numbness and weakness; foot numbness; and "chronic pain (back, knees, feet)." (Tr. 271-72).

At plaintiff's office visit that same date, Dr. Swedberg reported that plaintiff's fibromyalgia was currently stable on Elavil, Robaxin, and Celebrex. He also reported that plaintiff's hypertension and asthma were stable. (Tr. 270).

On May 11, 2007, plaintiff received treatment through a nurse practitioner at Dr. Swedberg's office. Plaintiff reported she was in a lot of pain with her fibromyalgia and normally takes Celebrex, but had been out of the medication for several weeks. It was noted that she depends on samples from the office and they were out. (Tr. 268). She was also taking Elavil and Robaxin. Plaintiff reported that Paxil did not seem to be working for her depression, she was frequently tearful and "down," and she had lost interest in her usual activities. She admitted to diffuse muscle pain and joint pain. Her medications were adjusted. (*Id.*). The following month, Dr. Swedberg reported that plaintiff's depression was much improved with an increase in Paxil and her fibromyalgia was stable. (Tr. 267). In July 2007, she was reported as "doing fair" with her osteoarthritis and doing well with her COPD/asthma. Her medications were continued. (Tr. 266).

On September 25, 2007, plaintiff received treatment through a nurse practitioner at Dr. Swedberg's office. Plaintiff reported that she was doing fairly well with her COPD and was trying to quit smoking. She attributed her weight gain to this effort. (Tr. 265). Plaintiff reported chronic right shoulder pain and was advised to increase the Darvocet. Plaintiff reported that

16

Celebrex helps the pain, but she could not afford it and relied on samples from the office. She reported trouble sleeping because of pain, intermittent tingling and pain in her hands, and intermittent right ankle pain. On examination, she had clear lungs, no wheezes, rales or rhonchi, strong equal radial pulses, full range of motion, and negative Tinel's and Phalen's sign. (Tr. 265).

Plaintiff was examined by Dr. Thomson on three more occasions: January 2007, July 2007, and January 2008. (Tr. 246-52). In January 2008, plaintiff told Dr. Thomson that she continued to ache "all over" and was especially bad over the last three months. (Tr. 467). Plaintiff reported bilateral hand tingling. On examination, plaintiff was positive for tender points in both the elbows, knees, and trapezius, had no acute synovitis in her fingers or wrists, and had normal range of motion. Dr. Thomson stated that "if needed, will do EMG" and continued to prescribe medication. (Tr. 467). He assessed fibromyalgia with IBS, insomnia, COPD/asthma, mechanical low back pain, and restless leg syndrome. (Tr. 467).

The record also contains treatment notes from David Parrett, M.D., from January 4, 2008 through June 11, 2008. (Tr. 468-75). Examination revealed pain on palpation of the back and lung wheezes. (Tr. 468, 470, 472, 474). Plaintiff also saw Dr. Parrett for a sore throat and coughing. (*Id.*). Dr. Parrett noted that plaintiff continued to smoke. (Tr. 475). Dr. Parrett also noted an asthma exacerbation which was secondary to being out of medication. (Tr. 470).

In March 2008, state agency reviewing physician, David Williams, M.D., opined that plaintiff could perform a range of light work consisting of lifting 20 pounds occasionally and 10 pounds frequently; standing and/or walking no more than 2 hours in an 8-hour workday; and sitting about 6 hours in an 8-hour workday with limited pushing/pulling in the upper extremities.

17

(Tr. 451-57). Dr. Williams discredited Dr. Swedberg's evaluation "due to inconsistencies with the totality of the evidence in file." (Tr. 457).

On June 16, 2008, Dr. Thomson assessed plaintiff's physical functional capacity and opined that plaintiff could lift and carry 10 pounds occasionally and less than 10 pounds frequently; she could stand and walk less than 2 hours in an 8-hour day; she needed to alternate sitting, standing and walking at will; and she had postural and environmental restrictions. Dr. Thomson attributed plaintiff's various restrictions to low back pain, COPD/asthma, fibromyalgia, and "likely" bilateral carpal tunnel syndrome. (Tr. 476-77). Dr. Thomson stated that plaintiff's mechanical low back pain and stiffness/gelling[4] from fibromyalgia will demand frequent changes of position to avoid increasing pain in her low back, neck, and shoulders. (Tr. 476).

### PLAINTIFF AND WITNESS' TESTIMONY AT THE HEARING

Plaintiff testified at the administrative hearing that she smoked "about a pack" of cigarettes a day and she acknowledged that her doctor told her to stop smoking. (Tr. 500-501). Plaintiff stated that she has a driver's license and drives. (Tr. 501). She estimated that she could drive about 2 hours before having to stop. (*Id.*). Her husband drove to the hearing and they stopped an hour after they started. (*Id.*).

Plaintiff acknowledged that she is basing her disability claim on fibromyalgia, hypertension, irritable bowel syndrome, arthritis, shortness of breath, and asthma. (Tr. 506). She testified that she saw Dr. Thomson at least twice a year for fibromyalgia and arthritis. (Tr. 506-07, 513). Plaintiff testified that her irritable bowel and hypertension were controlled with

---

[4]The term "gelling" is a rheumatology term meaning "stiffness after rest, which is typical of rheumatic diseases." McGraw-Hill Concise Dictionary of Modern Medicine. © 2002 by The McGraw-Hill Companies, Inc., http://medical-dictionary.thefreedictionary.com/Gelling.

medication. (Tr. 507-08). She also testified that she had a problem with "chemical asthma" when she smelled perfume/cologne, cleaning products, or fumes, and she would "go into a nasty coughing fit." (Tr. 508, 519-20). Plaintiff testified that her husband smoked around her and she had cut down on her smoking. (Tr. 508). She testified that due to trouble with restless leg syndrome, she averages about four hours of sleep a night. (Tr. 509-10).

Plaintiff testified that her "worst limiting symptom" was fibromyalgia. (Tr. 508). She reported that she is "in constant pain from my neck all the way down to my hips." (*Id.*). She said that she had back pain and hand numbness that was thought to be carpal tunnel. (Tr. 508, 515-16). Plaintiff denied having any EMG testing, stating that she could not afford to have the test performed. (Tr. 508-09, 514). Plaintiff testified that she had constant pain which was about a "six or better pain level" and her feet went numb at least three times a week. (Tr. 511).

Plaintiff reported difficulty sitting or standing for any long periods of time. (Tr. 511, 515, 517-18). She estimated that she could stand for about 15 minutes. (Tr. 517). She testified that she was supposed to wear wrist bands at night and she would wear them until she got bruises, then stop wearing them for awhile. (Tr. 522). She also acknowledged that she had not been in physical therapy "for years." (*Id.*). She occasionally used a non-prescribed cane. (Tr. 523).

As to her daily activities, plaintiff reported that it takes 3 to 4 hours to get "loosened up." She dusted, vacuumed, and napped during the day. (Tr. 518). She stated that her husband assisted her with cooking, washing dishes, and taking care of her personal needs. (Tr. 520-22).

Plaintiff's husband, Chester O'Neal, also testified at the hearing. (Tr. 523-27). At the time of the hearing Mr. O'Neal and plaintiff had been married for 33 years. (Tr. 524). Mr.

O'Neal testified that plaintiff's condition has progressively gotten worse. He noted she has more pain in her legs and kicks a lot at night. (*Id.*). If she tries to do more than run a vacuum, she will take "all kinds" of pain pills and then sleep for two or three days. (Tr. 524-25). As to her coughing spells, he has witnessed her cough to the extreme that she has vomited. (Tr. 525). He noted that she does not go to the store much anymore. If she needs something, she will go into the store and get what she needs. (*Id.*). He testified that he does most of the grocery shopping. (Tr. 526). Mr. O'Neal testified that he has to help her take showers and she cannot raise her arms to get undressed. (Tr. 527). When questioned by the medical expert, Mr. O'Neal testified that he smoked two packs of cigarettes a day inside their one bedroom home. (Tr. 530).

## MEDICAL EXPERT TESTIMONY

Dr. Lorber, a board certified orthopedic surgeon, testified as the medical expert at the administrative hearing. The ALJ asked Dr. Lorber to identify plaintiff's medically determinable impairments. Dr. Lorber considered plaintiff's impairments under a number of listings, including section 11.14 with respect to carpal tunnel syndrome, and sections 1.02A, 1.02B, and 1.04A for her musculoskeletal complaints. He found that the objective medical evidence and clinical findings satisfied none of them. (Tr. 530-31).

Dr. Lorber testified as to the diagnosis of pulmonary disease, noting the absence of a pulmonary function test and that plaintiff lived in a small home where an individual smoked. (Tr. 531).

Dr. Lorber testified that fibromyalgia is a purely subjective disease. (Tr. 531). He noted that lab testing, for example, the rheumatoid factor Epstein Bar, was negative and that the rheumatologist reported no joint deformities or active synovitis; thus, there was no rheumatologic

20

disorder present.  (Tr. 532).  Dr. Lorber further noted that the record did not demonstrate evaluation by a "number of different" specialists but instead plaintiff's treatment was largely provided by a general practitioner, Dr. Swedberg, and a rheumatologist, Dr. Thomson.  (Tr. 532). Dr. Lorber further noted that plaintiff took only three Darvocets per day, which was not strong pain medication.  (Tr. 532-33).  Dr. Lorber noted that plaintiff also did not have a treatment history of significant evaluations, injections, or ongoing physical therapy.  (Tr. 533).

Dr. Lorber did not believe that the assessment provided by state agency physician Dr. Williams, who limited plaintiff to standing for no more than two hours and lifting no more than 20 pounds occasionally, was supported by the evidence of record, although he did not explain why.  (Tr. 533).  Dr. Lorber opined that plaintiff could perform a range of medium level exertional work with no restrictions on standing, walking or sitting; which entailed frequent bending, stooping, crouching, and kneeling; and with no frequent repetitive overhead work with the left upper extremity.  (*Id.*).  Dr. Lorber further opined that the opinions of the treating physicians were not supported "by the objective evidence of record."  (Tr. 534).

Upon questioning by plaintiff's attorney, Dr. Lorber testified that there was no objective way of diagnosing fibromyalgia.  (Tr. 534).  He stated that he was not relying on Dr. Swedberg's opinion.  (Tr. 535).  Dr. Lorber opined that an examining physician may become an advocate for the patient and lose their objectivity.  He noted that Dr. Swedberg was not a specialist in musculoskeletal diseases.  (Tr. 534-35).  Dr. Lorber also stated that he took Dr. Thomson's opinion into consideration and opined that it was based on plaintiff's subjective complaints rather than objective findings.  (Tr. 535-36).

When further questioned about the objective measures for diagnosing fibromyalgia, Dr. Lorber discussed trigger/tender point counts. (Tr. 536). He noted that plaintiff had some tenderness in the cervical and trapezius areas, but he did not recall specific trigger/tender point counts being performed. (Tr. 536). According to Dr. Lorber, 12 out of 18 trigger points establishes the diagnosis of fibromyalgia. (Tr. 536-37). When asked if he held a personal opinion about fibromyalgia in general, Dr. Lorber replied, "You bet you." (Tr. 537). When asked "so you don't personally believe that it's (fibromyalgia) a valid syndrome?" Dr. Lorber replied, "That is correct, Sir." (*Id.*).

### THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTIONS

At the hearing, the VE testified that plaintiff's past work included work as a cashier, light, unskilled; home health aide, medium, semiskilled; store manager, light, skilled; private home care worker, medium, semi-skilled, which she performed at the light level; seamstress, light, unskilled; and assembler, light, unskilled. (Tr. 538).

The ALJ asked the VE to consider an individual with plaintiff's vocational characteristics, who could perform medium work with occasional overhead reaching with the left upper extremity. (Tr. 539). Based on this hypothetical, the VE testified that such an individual could perform all of plaintiff's past relevant work. (*Id.*).

The ALJ next asked the VE to consider the additional limitations of being restricted to working in a relatively clean air environment without excessive exposure to dust, fumes, gas, chemicals, and because of exposure to perfume, no contact with the general public. (Tr. 539-40). The VE testified that the individual could perform plaintiff's past work as a seamstress and assembler. (Tr. 540, Tr. 541-44).

22

The next hypothetical question involved an individual who was restricted as assessed by state agency physician Dr. Williams. The VE testified that the individual could also perform plaintiff's past work as a seamstress and assembler. (Tr. 540).

When asked if plaintiff were limited in accordance with the functional capacity assessment of either Dr. Swedberg or Dr. Thomson (Tr. 271-72, 476-77), the VE testified that plaintiff would be unable to perform any work. (Tr. 541).

## OPINION

Plaintiff argues the ALJ's RFC is based on the opinion of a biased medical expert. Plaintiff contends the ALJ completely disregarded the opinions of plaintiff's treating providers which, according to plaintiff, were entitled to controlling weight as they were supported by the record. Plaintiff assigns the following specific errors:

1. The ALJ erred when she accepted the opinion of Dr. Lorber as an "impartial medical expert."

2. The ALJ erred in accepting Dr. Lorber's opinion over that of plaintiff's treating physicians and in rejecting the fibromyalgia diagnosis.

3. The ALJ erred to plaintiff's prejudice by stating that plaintiff does not have a severe respiratory impairment.

4. The ALJ erred to plaintiff's prejudice in failing to give sufficient weight to a severe condition simply because medical records had described it as "stable."

5. The ALJ erred to plaintiff's prejudice by ignoring the opinions of treating physicians due to an absence of certain diagnostic tests.

6. The ALJ erred to plaintiff's prejudice by not recognizing Dr. Lorber's bias and disregarding his opinion.

7. The ALJ erred to plaintiff's prejudice in adopting a patently absurd opinion of plaintiff's physical RFC and in devaluing plaintiff's credibility because it contradicted said opinion.

23

8.    The ALJ erred to plaintiff's prejudice in adopting the opinion of a clearly prejudiced medical expert.

9.    The ALJ erred to plaintiff's prejudice by adopting the opinion of a vocational expert based on an invalid hypothetical.

## I. Weight assigned to the medical opinions

Because plaintiff's assignments of error 1, 2, 4, 5, 6, 7 and 8 essentially challenge the ALJ's weighing of the medical evidence in this case, the Court shall consider these assignments of error together. Plaintiff asserts the ALJ erred when she failed to give appropriate weight to the opinions of plaintiff's treating physicians, Drs. Swedberg and Thomson, and gave more weight to the opinion of the non-examining medical expert, Dr. Lorber, in assessing plaintiff's functional limitations from fibromyalgia. The undersigned agrees.

Fibromyalgia is a condition that "causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances." *Preston v. Secretary of Health and Human Services*, 854 F.2d 815, 817-820 (6th Cir. 1988).[5] "A person with a condition of fibromyalgia certainly could have serious enough pain to have a disability under the Social Security Act, but the condition does not automatically qualify as a listing level impairment." *Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 527 (6th Cir. 2003). *See also Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) ("diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits"). In the context of social security disability cases, fibromyalgia presents particularly challenging issues in determining credibility,

---

[5]In *Preston*, the term "fibrositis" was used instead of "fibromyalgia." Currently, the preferred term is fibromyalgia, rather than the older terms fibrositis and fibromyositis. *See* Merck Manual Online Medical Library, http://www.merckmanuals.com/professional/sec04/ ch042/ch042c. html?qt=fibromyalgia&alt=sh (last visited Aug. 19, 2011).

RFC, and disability because its symptoms are entirely subjective. *See Rogers v. Commissioner*, 486 F.3d 234, 243 n.3 (6th Cir. 2007). Unlike other medical conditions, fibromyalgia is not amenable to objective diagnosis and standard clinical tests are "not highly relevant" in diagnosing or assessing fibromyalgia or its severity. *Preston,* 854 F.2d at 820. *See also Rogers*, 486 F.3d at 243-44 ("in light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant"). Individuals suffering from fibromyalgia "manifest normal muscle strength and neurological reactions and have a full range of motion." *Rogers,* 486 F.3d at 244 (quoting *Preston*, 854 F.2d at 820). As the *Preston* Court explained:

> [F]ibrositis [the term previously used for fibromyalgia] causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. In stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results-a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion and testing of certain 'focal tender points' on the body for acute tenderness which is characteristic in fibrositis patients. The medical literature also indicates that fibrositis patients may also have psychological disorders. The disease commonly strikes between the ages of 35 and 60 and affects women nine times more than men.

854 F.2d at 817-18 (6th Cir. 1988).

A diagnosis of fibromyalgia involves testing a series of focal points for tenderness and ruling out other possible conditions through objective medical and clinical trials. *See Rogers*, 486 F.3d at 244. Fibromyalgia can be disabling even in the absence of objectively measurable signs and symptoms. *See Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) (fibromyalgia is a "disabling impairment" that can qualify an individual for disability payments even though "there are no objective tests which can conclusively confirm the disease."); *Kelley v.*

*Callahan,* 133 F.3d 583, 589 (8th Cir. 1998) ("Fibromyalgia, which is pain in the fibrous connective tissue components of muscles, tendons, ligaments, and other white connective tissues, can be disabling."); *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) ("Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia.").

In the instant case, it is undisputed that plaintiff suffers from fibromyalgia. Plaintiff's treating physicians, Drs. Swedberg and Thomson, have both diagnosed plaintiff as suffering from fibromyalgia and Dr. Williams, a state agency reviewing physician, determined that plaintiff's fibromyalgia is a medically determinable impairment. (Tr. 456). Most importantly, the ALJ made a factual finding at Step 2 of the sequential evaluation process that plaintiff's fibromyalgia is a severe impairment under the Social Security Regulations. (Tr. 20, Finding #3, citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Once the ALJ made a factual finding that plaintiff suffers from the severe impairment of fibromyalgia, it was incumbent upon the ALJ to apply the correct standard under existing Sixth Circuit precedent for evaluating this impairment.

Despite the ALJ's finding that fibromyalgia is a severe impairment, the ALJ imposed no work-related functional limitations as a result of this severe impairment in assessing plaintiff's RFC. In doing so, the ALJ rejected the opinions of plaintiff's treating physicians and gave more weight to the opinion of Dr. Lorber, the non-examining medical expert. The ALJ's decision in this regard is not supported by substantial evidence.

In assessing plaintiff's RFC, the ALJ relied heavily on the hearing testimony of Dr. Lorber, the orthopedic medical expert, whose opinion she gave "considerable weight." (Tr. 24). The ALJ's decision states, "*Based on the medical expert's testimony*, [plaintiff] can lift/carry up

26

to 25 lbs. frequently and 50 lbs. occasionally; she has no restrictions on standing, walking, or sitting and can do posturals frequently; however, she is limited to only occasional overhead reaching with the left upper extremity." (Tr. 22-23) (emphasis added).  However, Dr. Lorber testified that he did not believe fibromyalgia was a real syndrome (Tr. 537) and therefore imposed no restrictions on plaintiff's functional capacity based on her fibromyalgia.  Dr. Lorber opined that plaintiff's "*only* restriction would be with her left shoulder" due to her left rotator cuff syndrome.  (Tr. 533) (emphasis added).  The ALJ's decision does not acknowledge Dr. Lorber's disavowal of fibromyalgia as a valid medical condition.  The ALJ's adoption of the medical expert's RFC opinion, which failed to properly account for any limitations arising from plaintiff's fibromyalgia, is inconsistent with the ALJ's finding that fibromyalgia is a severe impairment.  *See* 20 C.F.R. § 416.945(a)(3) (ALJ must consider "all of the relevant medical and other evidence" in making RFC finding).  Therefore, the ALJ's reliance on the medical expert's opinion in this respect was erroneous.

In assessing plaintiff's credibility, the ALJ acknowledged that Dr. Lorber "was very skeptical of the fibromyalgia diagnosis" (Tr. 23) and relied on Dr. Lorber's testimony which attacked the basis for the *diagnosis* of plaintiff's fibromyalgia: the purported lack of records documenting "11 of the 18 tender point sites" specified for the classification of fibromyalgia (Tr. 23)[6] and the absence of referrals to other specialists who might have suggested different causes

---

[6]This Court has noted that more recently, physicians have not required a specific number of tender points to diagnose fibromyalgia:

According to a recent Merck Manual entry, fibromyalgia is "a common nonarticular disorder of unknown cause characterized by generalized aching (sometimes severe), widespread tenderness of muscles, areas around tendon insertions, and adjacent soft tissues, as well as muscle stiffness, fatigue and poor sleep."  A diagnosis is based on clinical findings of generalized pain and tenderness, especially if disproportionate to physical findings; negative laboratory results despite

for plaintiff's alleged symptoms. *Id.* While these two factors may be relevant for purposes of diagnosing the impairment, they are not relevant for purposes of determining plaintiff's RFC in light of the ALJ's Step 2 finding that plaintiff's fibromyalgia constitutes a severe impairment– one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. § 416.920(c). The Commissioner argues that plaintiff's diagnosis alone does not indicate the level of severity of a condition. The Court agrees and expresses no opinion on whether plaintiff may ultimately be found disabled on the basis of fibromyalgia. Nevertheless, it is disingenuous for the ALJ to determine fibromyalgia is a severe impairment which significantly limits plaintiff's ability to perform basis work activities and then assign no restrictions whatsoever based on the impairment. In determining plaintiff's RFC, it was incumbent upon the ALJ to assess the medical evidence to determine not whether plaintiff has fibromyalgia, but what limitations she suffers as a result and to include those functional restrictions in the RFC assessment.

In addition, the ALJ's decision on the weight to accord the treating physicians in this case is not supported by substantial evidence. The ALJ endorsed Dr. Lorber's opinion giving no weight to the more limiting functional capacity assessments of plaintiff's treating physicians

---

widespread symptoms; and fatigue as a predominant symptom. Tender or "trigger" points in the cervical, thoracic, and lumbar spinal areas, as well as the extremities, are palpated. Merck's notes that the "classic" diagnosis requires 11 of 18 of the specified points to produce pain upon palpation, *but that "most experts no longer require a specific number of tender points to make the diagnosis as originally proposed (more than 11 of 18).* Patients with only some of the specified features may still have fibromyalgia."

*Lawson v. Astrue*, 695 F. Supp.2d 729, 735 (S.D. Ohio 2010) (Beckwith, J.) (emphasis added) (citing Merck Manual Online Medical Library, http:// www. merck. com (last visited February 22, 2010)). In the instant case, Dr. Thomson found tenderness over the left glenohumeral joint and tender points at the trapezius erector spinae, iliac crests, and right SI joint area (Tr. 260) and positive tender points in plaintiff's elbows, knees, and trapezius. (Tr. 467).

because they lacked "objective evidence" to support such findings. (Tr. 23, 534, 535). However, the lack of objective evidence of fibromyalgia is not a proper basis for rejecting the treating physicians' assessments because fibromyalgia is, by its very nature, not subject to objective verification. *Rogers*, 486 F.3d at 243. By adopting Dr. Lorber's reasoning, the ALJ applied the incorrect analysis for evaluating fibromyalgia, *i.e.,* she focused on the lack of objective evidence.

The ALJ stated that Dr. Swedberg's assessment of plaintiff's functional capacity is based on plaintiff's "subjective complaints of pain, weakness, and numbness" and that Dr. Swedberg never provided "objective support or even a diagnosis for his conclusions." (Tr. 24, citing Tr. 271-72). The ALJ faulted Dr. Swedberg for relying on plaintiff's subjective reports of her symptoms and limitations even though fibromyalgia, by definition, is not typically subject to objective medical testing. *Rogers*, 486 F.3d at 245. Given the nature of fibromyalgia and the absence of objective evidence to confirm its severity, a physician must necessarily rely on his or her patient's self-reported pain and other symptoms as an "essential diagnostic tool" in determining the patient's limitations. *See Johnson v. Astrue*, 597 F.3d 409, 412 (1st Cir. 2009). The fact that Dr. Swedberg relied on plaintiff's self-reports of pain in reaching an opinion concerning plaintiff's limitations was not only proper but necessary given her fibromyalgia impairment. *Id.* at 414.

In addition, the ALJ criticized Dr. Swedberg for not including a statement of plaintiff's diagnoses on his functional capacity form. Yet, a review of the record shows Dr. Swedberg made that assessment contemporaneously with an office visit of the same date which reflects plaintiff's diagnoses of fibromyalgia, hypertension, and asthma. (Tr. 270).

The ALJ also stated that Dr. Swedberg often assessed plaintiff's impairments as being "stable." (Tr. 24). However, the fact that Dr. Swedberg assessed plaintiff's fibromyalgia as "stable" is not inconsistent with his finding that her functional capacity is nonetheless limited and does not mean that plaintiff did not experience the fatigue, decreased stamina, chronic pain, and other symptoms noted throughout the record which contributed to her limited functional capacity. As recognized by this Court, "[a] person can have a condition that is both 'stable' and disabling at the same time." *Hopkins v. Comm'r of Soc. Sec.,* No. 1:07–cv–964, 2009 WL 1360222, at *1, *17 (S.D. Ohio May 14, 2009) (Beckwith, J.; Hogan, M.J.) (citations omitted). Dr. Swedberg's characterization of plaintiff's fibromyalgia as "stable" does not undermine his assigned limitations.

The ALJ also rejected the treating rheumatologist's opinion because Dr. Thomson based his assessment for reduced stamina and lifting/carrying capacity on plaintiff's COPD/asthma and "likely" bilateral carpal tunnel syndrome–impairments the ALJ found to be nonsevere. (Tr. 24). Although Dr. Thomson relied in part on plaintiff's respiratory impairment and carpal tunnel syndrome for his functional capacity assessment, he also based plaintiff's need to alternate sitting, standing and walking on his finding that "stiffness/gelling from her fibromyalgia" will "demand frequent changes of position to avoid increasing pain" in plaintiff's low back, neck, and shoulder. (Tr. 476). The ALJ did not address any limitations related to plaintiff's fibromyalgia and concluded that Dr. Thomson "completed this functional assessment in accordance with the claimant's subjective assertions." (Tr. 24). Yet, "the fact that [plaintiff's] subjective complaints do not correlate with the objective medical findings is the hallmark of a fibromyalgia diagnosis." *Lawson v. Astrue.,* 695 F. Supp.2d 729, 737 (S.D. Ohio 2010) (Beckwith, J.) (citing *Preston*, 854

30

F.2d at 820). The ALJ did not impose any functional limitations on plaintiff's ability to sit, stand, or walk because of the lack of objective evidence when the absence of such evidence is the norm in fibromyalgia cases. As one Court has observed, "once the ALJ accepted the diagnosis of fibromyalgia, she also *had no choice* but to conclude that the claimant suffered from the symptoms usually associated with such condition, unless there was substantial evidence in the record to support a finding that claimant did not endure a particular symptom or symptoms." *Johnson*, 597 F.3d at 414 (emphasis in original) (quotation marks and citation omitted).

The Court also notes that the ALJ's decision does not reflect an analysis of the regulatory factors for weighing the treating physicians' opinions. As explained by the Sixth Circuit in *Wilson,* "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors–namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source–in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (discussing 20 C.F.R. § 404.1527(d)(2)). The ALJ must satisfy the clear procedural requirement of giving "good reasons" for the weight accorded to a treating physician's opinion: "[A] decision denying benefits 'must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.' Social Security Ruling 96-2p, 1996 WL 374188, at *5 (1996)." *Wilson*, 378 F.3d at 544. The specific reasons requirement exists not only to enable claimants to understand the disposition of their cases, but to ensure "that the ALJ applies the

31

treating physician rule and permit[] meaningful review of the ALJ's application of the rule." *Id.* Only where a treating doctor's opinion "is so patently deficient that the Commissioner could not possibly credit it" will the ALJ's failure to observe the requirements for assessing weight to a treating physician not warrant a reversal. *Id.* at 547.

In this case, certain factors tend to support affording the treating physicians' opinions substantial weight. Dr. Swedberg, a general family practitioner, treated plaintiff for her fibromyalgia and other impairments during some 35 visits over the span of four years. Dr. Thomson examined plaintiff on four occasions and is a specialist in rheumatology–a specialization frequently associated with the treatment of fibromyalgia. *See Benecke v. Barnhart*, 379 F.3d 587, 594 n. 4 (9th Cir. 2004); *Reardon v. Prudential Ins. Co. of America*, No. 1:05-cv-178, 2007 WL 894475, at *14 (S.D. Ohio March 21, 2007). Social Security Regulations provide that more weight is generally given to the opinion of a specialist about medical issues related to the area of specialty than to that of source who is not a specialist. *See* 20 C.F.R. §§ 404.1527(d) (5), 416.927(d)(5). The Court additionally notes that Dr. Williams' limitations on plaintiff's ability to stand is consistent with those of plaintiff's treating physicians to the extent they all agree that plaintiff does not have the capacity to stand and walk for a full eight-hour workday as Dr. Lorber opined. By failing to consider the factors listed in 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) in determining the weight to be given the opinions of plaintiff's treating physicians, the ALJ's rejection of the treating physicians' assessments of plaintiff's functional capacity is not supported by substantial evidence. *Cole v. Astrue*, __ F.3d at __, 2011 WL 2745792, at *6 (6th Cir. July 15, 2011) ("[T]he ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be

32

justified based upon the record.'") (quoting *Blakely,* 581 F.3d at 407). Because the Court cannot

say that the treating physicians' opinions are "so patently deficient that the Commissioner could

not possibly credit" them so as to excuse the ALJ's failure in this case, *Wilson*, 378 F.3d at 547,

the ALJ's error in this respect warrants a reversal and remand of this case for reconsideration of

plaintiff's RFC, with proper analysis of the weight to be given the treating physicians' functional

capacity assessments consistent with the treating source regulations, 20 C.F.R. §§

404.1527(d)(2), 416.927(d). *Wilson*, 378 F.3d at 546.

　　In a related vein and in conjunction with her credibility analysis, the ALJ states,

"Assuming [plaintiff] does have fibromyalgia, it is not shown to be disabling" because plaintiff

only takes the medication Darvocet, which is not a particularly strong pain medication, and she

has not been involved with treatment modalities that are characteristic of chronic pain patients

(*e.g.,* ongoing physical therapy, injections, TENS unit, evaluation by numerous specialists). (Tr.

23). Yet, the treatment records reflect that in addition to Darvocet, plaintiff was prescribed

many other medications in an effort to treat her fibromyalgia pain, but she was unable to

purchase these medications on her own because of a lack of medical insurance and therefore she

obtained sample medications from her doctor when available. *See, e.g.,* Tr. 260, 265, 280, 283,

284, 286, 294, 295, 299, 467. The reason posited by the ALJ, when considered in the context of

the whole record, does not detract from plaintiff's credibility. Nor did the ALJ cite to any

evidence showing that a TENS unit or injections are appropriate treatment modalities for

fibromyalgia.[7] In any event, given the undersigned's findings above that the ALJ failed to fully

---

　　　[7]Fibromyalgia treatment modalities include "exercise, local heat, stress management, drugs to improve sleep, and analgesics. . . . Rarely, injections of 0.5% bupivacaine or 1% lidocaine 1 to 5 mL are used to treat incapacitating areas of focal tenderness, but such injections should not be relied on as primary treatment." *See*

33

consider the nature and extent of plaintiff's limitations from fibromyalgia, the undersigned also concludes that the ALJ must reassess plaintiff's credibility on remand.

The Court recognizes that it is the province of the ALJ to resolve conflicts in the medical evidence and the ALJ here was faced with conflicting RFC assessments from the medical expert, plaintiff's treating physicians, and Dr. Williams, the state agency physician who found plaintiff was limited to walking/standing no more than two hours in an eight hour workday.[8] Here, however, the ALJ resolved that conflict by improperly relying on a medical advisor who did not have specialized knowledge in the relevant field, *i.e.,* rheumatology, and who did not believe that fibromyalgia even exists as a valid medical condition. Moreover, Dr. Lorber relied on the lack of objective physical findings in support of his opinion that plaintiff could perform medium work activity despite the fact that such objective findings are largely irrelevant in assessing the severity of fibromyalgia on plaintiff's functioning. *See Rogers*, 486 F.3d at 243-44. Dr. Lorber was wholly unqualified for the task of helping the ALJ understand how plaintiff's fibromyalgia impacted her RFC in this case. The ALJ erred in rejecting the treating physicians' evidence and relying on Dr. Lorber's testimony. These errors bear materially on the ALJ's conclusion that plaintiff retains the capacity to perform a full range of medium work with the exception of overhead lifting with the left arm.

This matter should be remanded to the Commissioner for reconsideration of plaintiff's RFC and the weight to afford plaintiff's treating physicians consistent with this Report and

---

Merck Manual Online Medical Library, http://www.merckmanuals.com/professional/sec04/ ch042/ch042c. html?qt=fibromyalgia&alt=sh (last visited Aug. 19, 2011).

[8]The ALJ did not discuss Dr. Williams' limitations on plaintiff's ability to stand for no more than two hours aside from noting that Dr. Lorber did not agree with Dr. Williams' March 2008 functional assessment. (Tr. 24).

Recommendation.  In addition, the Commissioner should be directed to appoint a new medical adviser who is a specialist in the appropriate medical specialty for the diagnosis and treatment of fibromyalgia to assist the ALJ in the reconsideration of this matter.

## II. Severity finding

Plaintiff contends the ALJ also erred by finding she did not have a severe respiratory impairment.

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities.  20 C.F.R. §404.1520(c).  Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting.  20 C.F.R. §404.1521(b).  Plaintiff is not required to establish total disability at this level of the sequential evaluation.  Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act.  *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984).  An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience."  *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985) (citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).  The severity requirement is a "*de minimus* hurdle" in the sequential evaluation process.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).

In determining plaintiff did not have a severe respiratory impairment, the ALJ acknowledged that plaintiff has asthma but stated that medical records consistently demonstrated

her condition was stable with medication. (Tr. 21). The ALJ also noted that plaintiff has never had a pulmonary function study and that an examination in September 2007 showed her lungs were clear with no wheezes, rales or rhonchi. (*Id.*). An asthma exacerbation in March 2008 was attributed to plaintiff being out of medication. (*Id.*). In addition, while plaintiff alleged she had chemical allergies and a hypersensitivity to perfumes, her subjective assertion was not supported by objective testing from a pulmonary specialist or allergist. (*Id.*). Finally, the ALJ noted that plaintiff continued to smoke despite being repeatedly advised to stop by her physician and lived in a smoke-filled environment which "strongly suggests that her respiratory impairment is not severe. . . ." (*Id.*).

Plaintiff has a long history of respiratory impairments. In January 2002, Dr. Saab, a pulmonary specialist, diagnosed reactive airway disease. (Tr. 210). Plaintiff has been treated by Dr. Swedberg since September 2002 for asthma/COPD. (Tr. 312). On two occasions, Dr. Swedberg observed plaintiff's adverse reaction to perfume exposure while in his office. (Tr. 276, 280-81). Both of plaintiff's treating physicians imposed environmental restrictions on plaintiff due to her COPD/asthma and allergies to perfume and chemical cleaners. (Tr. 272, 477). The state agency doctors likewise imposed environmental limitations, including avoiding even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 454, 462). Yet, the ALJ's decision contains no discussion or even mention of any of these physician opinions in assessing the severity of plaintiff's respiratory impairments. In the absence of any mention of these physicians' reports, which all imposed environmental restrictions on plaintiff's functional capacity, the Court is unable to discern if the ALJ overlooked these opinions or simply ignored them in making her finding of a non-severe respiratory impairment. Because the ALJ failed to

articulate any reasons for rejecting such limitations, the Court finds the ALJ's severity decision on this issue is not supported by substantial evidence.

### III. Vocational evidence

Plaintiff also argues the ALJ erred by relying on vocational testimony that was premised on an unsupported RFC. Because the Court has determined that the ALJ's RFC decision failed to properly account for plaintiff's limitations from fibromyalgia, the vocational expert's testimony in response to the ALJ's hypothetical questions, premised on such RFC, does not provide substantial evidence in support of the ALJ's decision. *See White v. Commissioner of Social Sec.*, 312 F. App'x 779, 789 (6th Cir. 2009) (ALJ erred in relying on answer to hypothetical question because it simply restated residual functional capacity which did not accurately portray claimant's physical and mental impairments).

### IV. This matter should be reversed and remanded for further proceedings.

This matter should be reversed and remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation. All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of her alleged onset date. *Faucher,* 17 F.3d at 176. On remand, the ALJ should properly evaluate plaintiff's fibromyalgia and other impairments; appoint a new medical adviser who is a specialist in the appropriate medical specialty for the diagnosis and treatment of fibromyalgia to assist the ALJ in the reconsideration of this matter; properly determine the weight to be accorded to the opinions of plaintiff's treating physicians and clearly articulate the rationale in support thereof; reconsider plaintiff's RFC and credibility

assessments; and provide a hypothetical question(s) to the VE that accurately portrays plaintiff's impairments.

## IT IS THEREFORE RECOMMENDED THAT:

This case be REVERSED and REMANDED for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: _8/23/2011_

Karen L. Litkovitz
United States Magistrate Judge

38

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

RACHEL G. O'NEAL,  
    Plaintiff

      vs

COMMISSIONER OF  
SOCIAL SECURITY,  
    Defendant

Case No. 1:10-cv-531  
Beckwith, J.  
Litkovitz, M.J.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).